1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

STEVEN DANIEL DEJARLAIS,

Petitioner,

v.

AUDREY KING, Warden, et al.,

Respondents.

Case No.: 15-cv-1005-BEN-MDD

**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE RE: PETITION FOR WRIT OF HABEAS CORPUS**

## I.  INTRODUCTION

This Report and Recommendation is submitted to United States District Judge Roger T. Benitez pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rule 72.1(c) of the United States District Court for the Southern District of California.

After reviewing the Petition (ECF No. 1), Respondent's Answer and Memorandum of Points and Authorities in support thereof ("Answer") (ECF Nos. 9, 9-1), supporting documents and pertinent

state court Lodgments, the Court **RECOMMENDS** the Petition be **DENIED** for the reasons stated below.

## II.  PROCEDURAL HISTORY

### A.  Federal Proceedings

On May 4, 2015, Steven Daniel DeJarlais ("Petitioner"), a state prisoner proceeding *pro se*, filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254.  (ECF No. 1).  Petitioner sets forth three claims: (1) there was insufficient evidence to sustain the finding he is a sexually violent predator ("SVP"); (2) California's Sexually Violent Predator Act ("SVPA") violates constitutional protections of due process, double jeopardy, and the bar on *ex post facto* punishment; and (3) the SVPA violates the constitutional guarantee of equal protection.  (ECF Nos. 1 at 43-54).  On July 27, 2015, Respondent filed an Answer and lodgments in support thereof.[1]  (ECF Nos. 9, 10, 11, 12, 13).  Petitioner did not file a traverse.

### B.  State Proceedings

On April 4, 2011, the San Diego County District Attorney filed a petition to civilly commit Petitioner as an SVP pursuant to California Welfare and Institutions Code § 6600.  (Lodg. No. 6 at 1).  On October

---

[1] Respondent misinterpreted the Petition to include two additional claims that Petitioner raised in the Court of Appeal, but not in the California Supreme Court: the SVPA is void for vagueness and the trial court made a reversible error in oral instruction of CALCRIM 224.  (ECF No. 9-1 at 3).  Petitioner explains the grounds for relief raised are in the "addendum" to the Petition.  (ECF No. 1 at 8).  The addendum attached does not raise the vagueness or CALCRIM 224 grounds for relief.  *Id.* at 15.

19, 2012, a jury found the petition to be true, and the court committed Petitioner to the California Department of Mental Health for an indeterminate period.  (*Id.*).

On November 5, 2012, Petitioner timely appealed.  *Id.*  On April 4, 2014, the California Court of Appeal affirmed the trial court's judgment.  (Lodg. No. 8 at 17).  Petitioner timely filed a petition for review with the California Supreme Court.  (Lodg. No. 9).  On June 18, 2014, the California Supreme Court denied Petitioner's petition for review.  (Lodg. No. 10).

## III.  STATEMENT OF FACTS

"[A] determination of a factual issue made by a State court shall be presumed to be correct."  28 U.S.C. § 2254(e)(1).  Petitioner has the "burden of rebutting the presumption of correctness by clear and convincing evidence."  *Id.*; *see Jeffries v. Wood*, 114 F.3d 1484, 1499 (9th Cir. 1997) (stating that federal courts are required to "give great deference to the state court's factual findings."), *overruled on other grounds by Lindh v. Murphy*, 521 U.S. 320 (1997).  Accordingly, the following facts are taken from the California Court of Appeal's opinion:

> [Petitioner] stipulated he was convicted of two qualifying offenses: raping K.S. in 1994, and raping M.K. in 1996.  Additionally, based on a 1990 incident, he pleaded guilty to corporal injury to his spouse, T.D.  In 1990, he pleaded guilty to corporal injury to his cohabitant, D.G.
>
> [Petitioner] was paroled from prison in 2004, and met his next victim, J.G., in May 2005.  One month after knowing her, he proposed marriage.  J.G. soon learned about [Petitioner's] criminal history on the Internet.  Therefore, around July 22, 2005, she first told [Petitioner] she was

3

15-cv-1005-BEN-MDD

ending the relationship.  But [Petitioner] pressured her into meeting two more times in July 2005.  On August 5, 2005, J.G. agreed to have sex with [Petitioner] one last time.  The next day, he went to her house uninvited, and she told him not to visit her home anymore.  On August 10, 2005, [Petitioner] telephoned J.G., saying he was waiting at her apartment and wanted to talk to her.  In her apartment building's parking area, he grabbed her, shoved her against a car, and refused to let her leave, saying he loved her and wanted to marry her.  J.G. told him to leave her alone because she wanted to end the relationship.  The next night at about 11:00 p.m., [Petitioner] climbed through J.G.'s apartment window, grabbed her and covered her mouth with his hand.  She was afraid to cry because her children were home and she was concerned about what he might do to them.  [Petitioner] was drinking alcohol, and five or six times pretended to kiss her but forced alcohol into her mouth.  She became dizzy and vomited.  Afterwards, [Petitioner] forcibly had sex with her three times, and remained in her room until 8:00 a.m. the next day.  At some unspecified subsequent date, police found [Petitioner] lurking outside J.G.'s apartment, and he fled in his vehicle, hitting a police officer.  He was convicted of reckless driving, felony evasion of a law enforcement officer, and violation of parole, and sentenced to seven years in prison.

*Prosecution Experts*

Psychologist Timothy Salz testified that [Petitioner] suffered from paraphilia not otherwise specified and antisocial personality disorder, noting that [Petitioner] had repeatedly committed sexual offenses against his female sexual partners after they rejected him.  Dr. Salz explained that [Petitioner's] history of violence started when he was ten years old and continued even after he had been convicted and incarcerated for sexual offenses, and while he was released on parole or probation.

4

15-cv-1005-BEN-MDD

Dr. Salz testified in reference to the SVPA (§ 6600, subd. (e)): "Okay. So this to me is the key feature to this case. So the statute defines 'predatory' as an act directed towards a stranger, an acquaintance—a stranger, a casual acquaintance with whom no *substantial* relationship exists or an individual with whom a relationship has been established or promoted for the primary purpose of victimization." (Emphasis added.) In light of the statutory definition, Dr. Salz testified at length regarding his conclusion that a "substantial" and well-founded risk existed that [Petitioner] would commit a predatory sexual act if he were released into the community: "Unfortunately, neither the statute nor any of the legal cases that I know about or any of the consultants that I consulted with about on this were able to give any real solid—real clear guidance as to what constitutes a 'substantial' relationship. [¶] So I looked it up in the dictionary. . . . You get words like, 'of or having substance. Real, actual, true, not imaginary, strong, solid, firm, considerable, ample, of considerable worth or value, important.'"

Dr. Salz analyzed [Petitioner's] relationships with each victim and concluded that except for his marital relationship, the others were not substantial. D.G. was a stripper or escort. [Petitioner] raped her after he caught her in bed with another man. K.S.'s husband was overseas during her approximately one-year relationship with [Petitioner]. When K.S.'s husband returned home, she sought to end her relationship with [Petitioner], who raped her. During [Petitioner's] two-year relationship with M.K., she was living with her husband. One day, as M.K. came home, [Petitioner] was wearing a mask and surprised her in her yard, where he raped her.

Dr. Salz testified regarding [Petitioner's] relationship with J.G.: "So they had been dating for, I guess, it turned out—in my report I wrote one month. It turns out it was actually a couple of months. After they were seeing each other for a month, he asked her to marry him. She kind of

5

went 'Whoa, this is a little odd.' She wasn't thinking the relationship was that substantial. [Otherwise] she wouldn't have questioned him asking her to marry him." Dr. Salz concluded [Petitioner's] relationships were "intensely sexual relationships as opposed to . . . substantial relationships," noting that [Petitioner] had told a defense psychologist, "All of our relationships were built on sex. It was only physical. I thought if we would have sex, they wouldn't leave me."

Dr. Salz clarified, "But the real question is, is [Petitioner] likely to commit a predator [*sic*] offense in the future. So the question becomes how well does he have to know someone before he would rape them, and I would suggest it doesn't have to be that well. [¶] I can certainly imagine [Petitioner] going to a bar—I mean, he obviously can be very charming, and women are clearly attracted to him—and taking a woman home. How many days or weeks would he have to know her before she rejected him, and he would rape her? I don't think it would take that many days or weeks. That's the clear question."

Psychologist Marianne Davis testified that [Petitioner] suffered from depressive disorder not otherwise specified, paraphilia not otherwise specified, and antisocial personality disorder. Regarding the paraphilia diagnosis, Dr. Davis stated "[Petitioner] didn't rape just once. We have five victims here. Some are raped multiple times, and that's highly significant in the literature [about paraphilias]." Dr. Davis added, "ordinary men when faced with a partner who is in distress or crying or in pain, will lose their sexual arousal. They will not be able to maintain an erection with a distressed partner. [Petitioner] clearly, except in one case, was able not only to maintain an erection but sometimes achieve erection and ejaculation and then go back and do it two more times in the space of one night."

Dr. Davis pointed out that [Petitioner] exhibited a pattern of sexual violence spanning 16 years: "He hurt [the victims] more than was necessary to get them to . . . submit . . . to having sex with him. That he hurt them after the fact

6

that he had sex with them." Dr. Davis concluded [Petitioner] was likely to commit other sexually violent predatory acts. [Petitioner] told her that since going to prison he had learned how to monitor himself and believed he was no longer as overpowering and aggressive as before. But that comment was a "red flag" to Dr. Davis, indicating [Petitioner] had "limited insights" regarding his mental disorder. Dr. Davis also stated that although [Petitioner] had completed an advanced anger management program in the past, he was subsequently paroled then reoffended against J.G. He also later violated prison rules by engaging in disruptive, violent conduct.

Dr. Davis, referring to J.G., concluded: "If [Petitioner is] willing to start stalking a woman and behaving this way to her when he's only known her a month, I think that he could just as easily get out and do that to someone he's only known for a week. . . . That, to my mind, you, know, we're getting narrower and narrower in terms of our time frame, and how long it is before he victimizes a woman."

On redirect examination, Dr. Davis was asked, "Now, the fact that [Petitioner and J.G.] knew each other for whether it was one month, two months, or three months, does that make a difference into [*sic*] your analysis on whether he's likely in the future to be at risk for committing another sexual offense that's predatory?" Dr. Davis replied, "No, it doesn't; that he—they had actually known each other longer than I knew from the original documents I was given did not leave [*sic*] me to change my opinion on that."

*Defense Experts*

Psychologist Mary Jane Alumbaugh testified that based on her interviews with [Petitioner] and her document review, he manifested "antisocial behavior" and "sexual abuse of an adult." She clarified she did not regard either condition as a "treatable diagnosable disorder," but used those terms descriptively. Dr. Alumbaugh did not find that

7

15-cv-1005-BEN-MDD

[Petitioner] was likely to engage in predatory sex crimes, commenting that he had not done so in the past.

Defense counsel asked Dr. Alumbaugh to explain the basis of [Petitioner's] sexual crimes. She replied that as a child, [Petitioner] saw his father inflict domestic violence on his mother. Moreover, [Petitioner] was twice sexually abused as a child. Dr. Alumbaugh concluded: "It is a combination of the modeling behavior of the violence in an intimate relationship and a combination layered on, a role model that was violent and he learned violence in the home modeling, and this kind of basic instability within the context of a relationship that when he is threatened with abandonment or separation, it triggers all of this. It just pulls the plug on this to be violent, to be sexual, because of the sexual abuse, and [the victim] will stay with [Petitioner]. [¶] [His sexual violence] is only triggered within the context of separation. I think what I want to say is on the outside [Petitioner] looks like this big tough guy. Internally there's a whole lot of the little boy left that doesn't want to be left, wants to protect his mom, wants to keep his mom with him, and doesn't know what to do but act violently like dad did."

Psychologist Lisa Jeko testified that [Petitioner] committed sexual abuse of an adult, and had antisocial personality disorder with narcissistic traits. She did not diagnose him with paraphilia. Dr. Jeko did not find that [Petitioner's] prior sexual offenses were predatory nor believe that he would engage in future predatory sexual offenses.

Both prosecution and defense experts who administered an actuarial instrument called the Static-99-R to determine [Petitioner's] likelihood of engaging in sexually violent predatory behavior gave him a score of six, which puts him in the high risk range for reoffending. Both prosecution and defense experts also administered the PCL-R Hare psychopathy checklist to determine [Petitioner's] level of personality disorder, and he scored between 27 and 30, which is considered in the high range for psychopathy.

15-cv-1005-BEN-MDD

Dr. Davis concluded this score indicates, "[Petitioner] is undeterred by consequences and that he's highly manipulative and can be very charming . . . making it much more likely that he'll be able to entice another woman into a relationship with him."

(Lodg. No. 8 at 2-8).

## IV. STANDARD OF REVIEW

Title 28, U.S.C. § 2254(a) provides the scope of review for federal habeas corpus claims:

The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the grounds that he is in custody in violation of the Constitution or laws or treaties of the United States.

As amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, 28 U.S.C. § 2254(d) provides:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

15-cv-1005-BEN-MDD

Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the United States Supreme] Court's decisions . . . ." *Williams v. Taylor*, 529 U.S. 362, 412 (2000).  A state court's decision may be "contrary to" clearly established Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [the Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the Court's] precedent." *Id*. at 404-06.

A state court decision may involve an "unreasonable application" of Supreme Court precedent "if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 407.  An unreasonable application may also be found "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id*.; *Wiggins v. Smith*, 539 U.S. 510, 520 (2003); *Clark v. Murphy*, 331 F.3d 1062, 1067 (9th Cir. 2003).

An unreasonable application of federal law requires the state court decision to be more than incorrect or erroneous.  *Lockyer v. Andrade*, 538 U.S. 63, 76 (2003).  Instead, the state court's application must be "objectively unreasonable." *Id*.  In order to satisfy § 2254(d)(2), a federal habeas petitioner must demonstrate that the factual findings upon which the state court's adjudication of his claims

1  rests, assuming it rests upon a determination of facts, are objectively

2  unreasonable. *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).  Even if

3  a petitioner can satisfy § 2254(d), the petitioner must still demonstrate

4  a constitutional violation.  *Fry v. Pliler*, 551 U.S. 112, 119-22 (2007);

5  *Frantz v. Hazey*, 533 F.3d 724, 735-36 (9th Cir. 2008) (en banc).

6     Petitioner presented all of his claims raised in his federal habeas

7  Petition to the state trial, appellate and supreme courts in direct

8  review.  (Lodg. Nos. 8, 9).  The appellate court denied Petitioner's

9  claims on the merits.  (Lodg. No. 8).

10 ## V.  DISCUSSION

11 **A.  Claim 1: Insufficiency of Evidence**

12 **1.  Relevant Background**

13    The SVPA permits indeterminate civil commitment of SVPs.

14 CAL. WELF. & INST. §6600.  The prosecution must prove that: "(1) the

15 person was convicted of a sexually violent offense against one or more

16 victims; (2) the person suffers from a current diagnosed mental

17 disorder affecting his volitional or emotional capacity; and (3) the

18 disorder makes the person a danger to the health and safety of others

19 in that it was likely that he will engage in sexually violent predatory

20 criminal behavior."  (Lodg. No. 6 at 10) (citations omitted).  Predatory

21 is defined as "an act [that] is directed toward a stranger, a person of

22 casual acquaintance with whom no substantial relationship exists, or

23 an individual with whom a relationship has been established or

24 promoted for the primary purpose of victimization."  CAL. WELF. &

25 INST. §6600(e).

15-cv-1005-BEN-MDD

1   **2.  Summary of Arguments**

2          Petitioner contends there was insufficient evidence to support

3   the finding that he is an SVP.  (Lodg. 9 at 29).  Petitioner concedes

4   that the SVPA does not require his previous acts be predatory and only

5   requires that a likelihood exists that his future acts will be predatory.

6   (*Id*. at 30).  He argues that because he had substantial relationships

7   with each of the victims it is unreasonable to conclude he would

8   engage in predatory behavior.  (*Id*.).  Petitioner explains, "to infer

9   predatoriness from non-predatory offenses, requires something more,

10  to suggest the likelihood of future predatory offenses," and that

11  "'something more' is absent" from the case.  (*Id*.).

12         Respondent argues that this Court may not disagree with a

13  California Court of Appeal decision regarding a state law claim, such

14  as this question regarding the SVPA.  (ECF No. 9-1 at 15).

15  Respondent argues that upholding the finding that Petitioner is an

16  SVP means the statutory requirement of predatoriness, as defined by

17  the SVPA, was met.  (*Id*.)

18  **3.  Legal Standards**

19         Under California law, the test for sufficiency of evidence to

20  support a commitment under the SPVA is the same test for sufficiency

21  of evidence to support a criminal conviction.  *People v. Mercer*, 70 Cal.

22  App. 4th 463, 466 (1999).  The court must "review the entire record in

23  the light most favorable to the judgment to determine whether

24  substantial evidence supports the determination below."  *Id.* (citing

25  *People v. Johnson*, 26 Cal. 3d 557, 576-578 (1980)).  To be substantial,

15-cv-1005-BEN-MDD

evidence must be "of ponderable legal significance . . . reasonable in nature, credible and of solid value." *Johnson*, 26 Cal. 3d at 576 (citing *Estate of Teed*, 112 Cal. App. 2d 638, 644 (1952)).  The court "may not redetermine the credibility of witnesses, nor reweigh any of the evidence, and must draw all reasonable inferences, and resolve all conflicts, in favor of the judgment." *People v. Poe*, 74 Cal. App. 4th 826, 830 (1999) (citing *Mercer*, 70 Cal. App. 4th at 466).

The California Supreme Court explained that the SVPA "does not prohibit the trier of fact at the trial, in deciding whether the defendant is likely to commit sexually violent acts upon release, from taking into account past acts of sexual violence, even if the victims were not strangers, casual acquaintances, or persons cultivated for victimization." *People v. Torres*, 25 Cal. 4th 680, 686 (2001).

California's sufficiency of evidence standard is the same under federal due process clauses. *People v. Berryman*, 6 Cal. 4th 1048, 1082-83 (1993).  Under clearly established federal law, the question is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements . . . beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see Johnson v. Louisiana*, 406 U.S. 356, 362 (1972).

**4. Analysis**

Viewing the evidence in the light most favorable to the prosecution shows a rational trier of fact could have found the evidence against Petitioner was sufficient to prove a substantial likelihood he

13

would engage in future predatory acts.  As stated by the California

Court of Appeal:

> As noted, the record evidence supports the finding that
> [Petitioner] is likely to commit a predatory sexual offense if
> he is released to the community:  Three psychologists,
> including a defense expert, testified that [Petitioner] scored
> high on the actuarial instrument used to measure just such
> a likelihood.  Further, [Petitioner] was incarcerated and
> released on parole on different occasions, and was not
> deterred from committing sexual offenses.  Dr. Davis
> testified in reference to the J.G.'s case that the time between
> when [Petitioner] meets a woman and victimizes her is
> narrowing.  Dr. Davis also noted [Petitioner] had not
> acquired sufficient insight into his violent behavior.  As
> noted, Dr. Salz correctly identified the statutory requirement
> and testified regarding [Petitioner's] likelihood of
> committing a violent sexual act with a stranger.  The
> discussion regarding whether [Petitioner's] past relations
> were substantial did not affect the analysis regarding the
> specific question of future offenses.
>
> [Petitioner] also argues, "Two defense experts said
> [Petitioner] was simply showing his sociopathic traits in
> raping the victims, like any domestic abuser or criminal
> might do.  Neither saw evidence [Petitioner] was aroused by
> his victims' lack of consent, as opposed to being oblivious of
> it."  However, in light of the substantial evidence supporting
> the jury's finding and the applicable standard of review, it is
> immaterial that defense experts reached a different
> conclusion.  It is also unavailing that Dr. Salz used a
> dictionary to define the word "substantial," which appears in
> the SVPA.  As noted, Dr. Salz correctly set forth the SPVA's
> requirement that he find [Petitioner] would commit future
> predatory sexual acts.  "'The credibility of the experts and
> their conclusions [are] matters [to be] resolved . . . by the
> [trier of fact]' and '[w]e are not free to reweigh or reinterpret

15-cv-1005-BEN-MDD

1
2

[that] evidence.'" (*People v. Poulson* (2013) 213 Cal.App.4th 501, 518.)

3

(Lodg. No. 8 at 12-13).

4
5
6
7
8
9
10
11
12

Three psychologist experts testified Petitioner tested high on the actuarial instrument used to measure likelihood of recidivism. (*Id.*). Additionally, Petitioner has a history of reoffending while on parole, evincing that serving a prison sentence did not deter him from committing sexual offense based crimes. (*Id.*). One expert recognized that Petitioner's relationships with women have been decreasing in length before he commits a sexual offense against them. (*Id.*). Based on this evidence, a rational jury could reasonably find Petitioner is substantially likely to commit future predatory acts.

13
14
15
16
17

The California Court of Appeal did not unreasonably apply clearly established federal law to Petitioner's sufficiency of evidence claim by determining there was a substantial likelihood he would engage in future predatory acts. Accordingly, the Court **RECOMMENDS** claim (1) be **DENIED**.

18
19

**B.  Claim 2: Due Process, Ex Post Facto, and Double Jeopardy Violations**

20

**1. Statutory Background**

21
22

The California Court of Appeal summarized the relevant background as follows:

23
24
25

*Applicable law*
I. *Statutory Background*
    The SVPA provides for the involuntary civil commitment of persons who, in a unanimous jury verdict

15

after trial, are found beyond a reasonable doubt to be SVP's. (CAL. WELF. & INST. §§ 6603(e)&(f), 6604.)  The term "'[s]exually violent predator' means a person who has been convicted of a sexually violent offense against one or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." (CAL. WELF. & INST. § 6600(a)(1).)  As originally enacted, the SVPA provided for a two-year commitment term.  The SVPA now provides for an indeterminate term of confinement for persons who are found to be SVPs. (*People v. Shields* (2007) 155 Cal.App.4th 559, 562-563; §§ 6604, 6604.1.)

The Department [of Mental Health] is required to review the mental condition of a committed SVP at least annually, and the court may appoint an expert or the committed person may retain one. (§ 6604.9(a).)  If the Department concludes the committed individual no longer meets the requirements of the SVPA, or that conditional release is appropriate, it must authorize the filing of a petition for release by the committed individual. (§ 6604.9(b)&(d).)  After a probable cause hearing, if the court determines that the petition has merit, the committed person is entitled to a trial, with all constitutional protections as provided at the initial commitment hearing.  At the trial, if the state opposes the petition, it must prove beyond a reasonable doubt that the committed individual remains an SVP. (§ 6605(a)(2)&(3).)  If the trier of fact finds in the committed person's favor, the person must be unconditionally released and discharged. (§ 6605(b).)

(Lodg. No. 8 at 9-10).

**2.  Summary of Arguments**

Petitioner asserts that California's SVPA violates: (1) federal due process by placing the burden on an SVP to prove he is no longer an

15-cv-1005-BEN-MDD

SVP in order to terminate his commitment; (2) the *ex post facto clause* because it is punitive; and (3) federal double jeopardy because an indefinite commitment with the burden placed upon him to prove he no longer qualifies as an SVP means the SVPA is punitive.  (Lodg. No. 9 at 38).  Respondent states that the California Court of Appeal reasonably and properly applied controlling law when denying those claims based on both California Supreme Court and United States Supreme Court precedent.  (ECF No. 9-1 at 17).

### 3. Legal Standards

#### a. Due Process

Civil commitment does not violate the due process clause if there is proof of dangerousness coupled with proof of some additional factor, such as a mental illness or abnormality.  *People v. McKee*, 47 Cal. 4th 1172, 1188 (2010) (citing *Kansas v. Hendricks*, 521 U.S. 346, 357 (1997)).  Additionally, requiring the committed person to prove they no longer meet the civil commitment requirements does not violate due process.  *Id.* at 1191 (citing *Jones v. United States*, 463 U.S. 354, 367 (1983)).

#### b. *Ex Post Facto* and Double Jeopardy

The *ex post facto clause* provides: "No state shall . . . pass any . . . ex post facto law . . . ."  U.S. CONST. art. I, § 10.  It prohibits laws which "retroactively alter the definition of crimes or increase the punishment for criminal acts."  *Collins v. Youngblood*, 497 U.S. 37, 43 (1990).  If an act is not punitive, it is not within the scope of the *ex post facto clause*.  *See McKee*, 47 Cal. 4th at 1194 (citing *Hendricks*, 521 U.S. at 363-64).

17

1   The double jeopardy clause provides: "Nor shall any person be

2   subject for the same offence to be twice put in jeopardy of life or limb."

3   U.S. CONST. amend. V.  The Court has interpreted the double jeopardy

4   clause to prohibit "punishing twice, or attempting a second time to

5   punish criminally, for the same offense." *Witte v. United States*, 515

6   U.S. 389, 396 (1995).  If an act is civil, and not punitive, it cannot be

7   considered violative of the double jeopardy clause.  *Hendricks*, 521 U.S.

8   at 369.

9   **4. Analysis**

10  **a. Due Process**

11  In *Taylor*, the Ninth Circuit explained in regards to due process

12  that "the Supreme Court has not definitively addressed the

13  constitutionality of release procedures that place the burden of proof

14  upon the individual challenging continued commitment." *Taylor v.*

15  *San Diego Cty.*, No. 12-55030, 2015 U.S. App. LEXIS 16002, at *21

16  (9th Cir. Sept. 9, 2015).  In a federal habeas petition, "where there is

17  no clearly established federal law, the state court cannot be deemed

18  unreasonable." *Id.* at *21 (citing *Glebe v. Frost*, 135 S.Ct. 429, 431

19  (2014)).  The court concluded that the California Court of Appeal did

20  not unreasonably apply federal law in denying a due process claim on

21  the SVPA.  *Id.* at *22.

22  Petitioner asserts the same due process argument as in *Taylor*.

23  (Lodg. No. 9 at 38).  The Court of Appeal found the SVPA did not

24  violate the federal Constitution's due process clause.  (Lodg. No. 8 at

25  15).  Here, as in *Taylor*, the California Court of Appeal did not

18

1  unreasonably apply federal law in denying Petitioner's due process

2  claim.

3       **b.  *Ex Post Facto* and Double Jeopardy**

4       The United States Supreme Court found that a Kansas statute

5  similar to California's SVPA did not violate the Constitution's double

6  jeopardy prohibition or its ban on *ex post facto* lawmaking because

7  Kansas' Sexually Violent Predator Act does not impose punishment.

8  *See Hendricks*, 521 U.S. at 370-71.

9       If the SVPA is a civil statute and does not impose criminal

10  punishment, there is no *ex post facto* or double jeopardy violation.

11  Determining whether a statute is criminal or civil is a question of

12  statutory construction.  *Hendricks*, 521 U.S. at 361.  In doing so, the

13  court looks to whether a civil proceeding was intended and whether

14  the "statutory scheme [is] so punitive either in purpose or effect as to

15  negate [the State's] intention to deem it civil."  *Id.* (citations omitted).

16       California's SVPA is not punitive.  First, it was intended to be a

17  civil proceeding.  The Act is located within the Welfare and

18  Institutions code with other civil commitment procedures and not in

19  the Penal code.  *Landau*, 214 Cal. App. 4th at 45.  Facially, there is

20  nothing to suggest the legislature desired to create anything but a civil

21  commitment statutory scheme to protect the public from harm.  *See*

22  *Hendricks*, 521 U.S. at 361.  Second, the SVPA is not so punitive to

23  negate the State's intention to deem it a civil proceeding.  The SVPA

24  restricts the freedom of a small segment of society to protect the public

25  from dangerously mentally ill persons.  *People v. Landau*, 214 Cal.

App. 4th 1, 45 (2013).  In the event the person no longer qualifies as an SVP, the person is entitled to release.  *Id*.  The SVPA does not violate the *ex post facto clause* or the double jeopardy clause.

Accordingly, the Court **RECOMMENDS** claim (2) be **DENIED**.

**C.  Claim 3: Equal Protection Clause Violation**

Petitioner argues the SVPA "denies equal protection for a defendant confined within its provisions, as compared to defendants subject to other civil commitment schemes, who must periodically be assessed for danger, like Mentally Disordered Offenders, or those found not guilty by reason of insanity."  (Lodg. No. 9 at 39).

The Ninth Circuit in *Taylor* held that "the California Court of Appeal did not unreasonably apply clearly established federal law to [the petitioner's] equal protection claim by determining that sexually violent predators are not similarly situated to other civilly committed offenders."  *Taylor*, 2015 U.S. App. LEXIS at *21-22.  The court explained, "[s]exually violent predators are in a special category of civilly committed offenders because they have a demonstrated sexually violent criminal history and are mentally ill, thereby portending the likelihood of future sexually violent behavior.  Given the nature of the harm they represent to themselves and the community, the state has an elevated interest in ensuring that they are identified, treated, and detained for as long as they meet the sexually violent predator criteria."  *Id*.

15-cv-1005-BEN-MDD

1    Petitioner's argument is identical to the equal protection

2    argument rejected by the Ninth Circuit in *Taylor*.  Accordingly, the

3    Court **RECOMMENDS** claim (3) be **DENIED**.

4    **VI.  CONCLUSION**

5    For the foregoing reasons, **IT IS HEREBY RECOMMENDED**

6    that the District Court issue an Order: (1) Approving and Adopting

7    this Report and Recommendation; and (2) **DENYING** Petitioner's

8    Petition for Writ of Habeas Corpus in its entirety.

9    **IT IS HEREBY ORDERED** that any written objections to this

10   Report must be filed with the Court and served on all parties no later

11   than **October 30, 2015**.  The document should be captioned

12   "Objections to Report and Recommendation."

13   **IT IS FURTHER ORDERED** that any reply to the objection

14   shall be filed with the Court and served on all parties no later than

15   **November 13, 2015**.  The parties are advised that the failure to file

16   objections within the specified time may waive the right to raise those

17   objections on appeal of the Court's order.  *See Turner v. Duncan*, 158

18   F.3d 449, 455 (9th Cir. 1998).

19

20   **IT IS SO ORDERED.**

21

22   Dated:   October 14, 2015

23

24   Hon. Mitchell D. Dembin
     United States Magistrate Judge

25

21

15-cv-1005-BEN-MDD